LIBERTY CABLE COMPANY, INC., Sixty Sutton Corp. and Jack A. Veerman, Plaintiffs,

v.

The CITY OF NEW YORK and Ralph A. Balzano, Commissioner of Department of Information Technology and Telecommunications, The New York State Commission on Cable Television, William B. Finneran, Gerard D. Di Marco, Barbara T. Rochman, David F. Wilbur, and John Passidomo, Defendants,

The United States of America, Time Warner Cable of New York City and Paragon Cable Manhattan, Defendants–Intervenors.

No. 94 Civ. 8886 (LAP).

United States District Court, S.D. New York.

March 13, 1995.

Robert Begleiter, Lloyd Constantine, Leslie F. Spasser, Eliot Spitzer, Constantine & Partners, New York City, for plaintiff Liberty Cable Co., Inc.

W. James MacNaughton, Woodbridge, NJ, for plaintiffs Sixty Sutton Corp. and Jack A. Veerman.

Paul A. Crotty, Corp. Counsel of the City of New York by Lewis S. Finkelman, Daniel J. Struck, New York City, for defendants The City of New York and Ralph A. Balzano.

Dennis C. Vacco, Atty. Gen. of State of New York by Marilyn T. Trautfield, Jeanne Lahiff, New York City, for defendants The New York State Com'n on Cable Television, William B. Finneran, Gerard D. Di Marco, Barbara T. Rochman, David F. Wilbur, and John Passidomo.

Mary Jo White, U.S. Atty. by Kathy S. Marks, Asst. U.S. Atty., New York City, for defendant-intervenor The U.S.

Martin J. Schwartz, Richard G. Primoff, Rubin Baum Levin Constant & Friedman and Stuart W. Gold, Rowan D. Wilson, Cravath, Swaine & Moore, New York City, for defendants-intervenors Time Warner Cable of New York City and Paragon Cable Manhattan.

## *OPINION*

PRESKA, District Judge:

Plaintiffs Liberty Cable Co., Inc. ("Liberty"), Sixty Sutton Corp. ("Sixty Sutton"), and Jack A. Veerman seek, *inter alia,* a declaratory judgment that 47 U.S.C. §§ 522(7) and 541(b) are unconstitutional. Before me now is their motion for a preliminary injunction against agencies and officials of New York State (the "State") and the City of New York (the "City") and defendants' motion to dismiss the complaint. For the reasons stated below, the complaint is dismissed as to certain claims and, as to the remainder, plaintiffs' motion for a preliminary injunction is denied.

## *BACKGROUND*

I. *The Statutory Scheme Governing Cable Television*

"Cable operators" in the City of New York are regulated on the federal, state, and city level. On the federal level, the Cable Communications Policy Act of 1984, 47 U.S.C. §§ 521 *et seq.* (the "Cable Act") regulates "cable operators." A "cable operator" is defined in pertinent part as "any person or group of persons ... who provides cable service over a cable system and directly or through one or more affiliates owns a significant interest in such cable system." 47 U.S.C. § 522(5). A "cable system" is defined in pertinent part as:

> a facility, consisting of a set of closed transmission paths and associated signal generation, reception, and control equipment that is designed to provide cable service which includes video programming and which is provided to multiple subscribers within a community, but such term

does not include ... a facility that serves only subscribers in 1 or more multiple unit dwellings under common ownership, control, or management, unless such facility or facilities uses any public right-of-way.

47 U.S.C. § 522(7). The exclusion in the definition of a cable franchise has been referred to as the "private cable exemption."

Aside from exceptions not relevant here, "a cable operator may not provide cable service without a franchise." 47 U.S.C. § 541(b). A "franchise" is "an initial authorization, or renewal thereof ... issued by a franchising authority ... which authorizes the construction or operation of a cable system." 47 U.S.C. § 522(9). A "franchising authority" is defined as "any governmental entity empowered by Federal, State, or local law to grant a franchise." 47 U.S.C. § 522(10). Thus, a cable operator must look to state and/or local authorities to obtain a franchise.

However, not all types of cable systems need comply with this regulatory scheme. Under the "private cable exemption" of the Cable Act, a cable system is exempt from these franchising requirements if it meets two tests. First, it must be a system confined to commonly owned, controlled, or managed multiple unit dwellings. 47 U.S.C. § 522(7). Second, the system must not use any public right-of-way, for example, by placing coaxial cable or hard wire above or under public streets or rights of way. *Id.* Traditional cable systems, which are subject to regulation, deliver programming by means of coaxial cables that physically connect the cable operator with the subscriber and that generally are laid under city streets or along utility lines.

■ Satellite master antenna television ("SMATV"), however, is a type of cable service that can fit within the private cable exemption and, when it does, need not obtain a franchise. *See F.C.C. v. Beach Communications,* — U.S. ——, ———— , 113 S.Ct. 2096, 2099–2100, 124 L.Ed.2d 211 (1993) (cit-

ing *In re Definition of a Cable Television Sys.,* 5 F.C.C.Rcd. 7638 (1990)).[1] SMATV provides cable service by means of a satellite dish and reception facilities installed on the grounds of private buildings. Under 47 U.S.C. § 522(7), a SMATV system that uses cable to link more than one multiple unit dwelling under common ownership, control, or management falls within the private cable exemption. However, a SMATV system that uses cable to link more than one multiple unit dwelling *not* under common ownership, control, or management does not fall within the private cable exemption and is subject to the regulation imposed by the Cable Act.

After the federal regulations, the next levels of regulation a would-be cable operator in the City of New York must look to are the State and then the City. New York law provides that a cable television system may not commence or expand its operations without a franchise from the municipality in which it proposes to provide or expand service. N.Y.Exec.Law § 819(1) (McKinney 1982). In New York, a "cable television system" is defined as:

> any system which operates for hire the service of receiving and amplifying programs broadcast by one or more television or radio stations or any other programs originated by a cable television company or by any other party, and distributing such programs by wire, cable, microwave or other means, whether such means are owned or leased, to persons in one or more municipalities who subscribe to such service.

N.Y.Exec.Law § 812(2) (McKinney 1982 & Supp.1995). New York law also authorizes municipalities to grant the franchises which are required of cable television systems:

> A municipality shall have the power to require a franchise of any cable television system providing service within the municipality, notwithstanding that said cable television system does not occupy, use or in any way traverse a public street. The

---

1. The litigation in the *Beach* case has been fairly protracted. For ease of reference, the decisions will be referred to as follows: *Beach Communications v. F.C.C.,* 959 F.2d 975 (D.C.Cir.1992) (*"Beach I "*), *appeal after remand,* 965 F.2d 1103

(D.C.Cir.1992) (*"Beach II "*), *rev'd,* — U.S. ——, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) (*"Beach III "*), *on remand,* 10 F.3d 811 (D.C.Cir.1993) (*"Beach IV "*).

provision of any municipal charter or other law authorizing a municipality to require and grant franchises is hereby enlarged and expanded, to the extent necessary, to authorize such franchises.

N.Y.Exec.Law § 819(2). Once a franchise has been awarded by the municipality, it must be confirmed by the New York State Commission on Cable Television ("NYSCC") to be effective. N.Y.Exec.Law § 821(1) (McKinney 1982).

In New York City, the municipal franchising agency authorized by the New York City Charter to grant franchises to cable television systems is the Department of Information Technology and Telecommunications ("DOITT"), formerly the Department of Telecommunications and Energy. Chapter 48, § 1072(c). On October 13, 1993, the New York City Council authorized Resolution No. 1639 ("Resolution 1639"), which states in pertinent part that:

> The Council authorizes the Department of Telecommunications and Energy to grant non-exclusive franchises for the provision of cable television services and the installation of cable television facilities and associated equipment on, over, and under the inalienable property of the City of New York.

(Resolution 1639).[2]

On February 24, 1995, after the plaintiffs had commenced the instant action, DOITT issued a notice of rulemaking regarding solicitations for franchises for the provision of cable service in a manner that does *not* use the inalienable property of the City (the "New Rulemaking"). (Second Bronston Aff. ¶¶ 1–2, Ex. A).[3] The notice stated, *inter alia*, that the public written comment period for the proposed rules will close on April 3, 1995, and a public hearing is scheduled for April 4, 1995. (Second Bronston Aff. ¶ 3, Ex. A). The proposed rules also include deadlines for the submission of franchise applications, DOITT's review of such applications,

and the preparation of agreements. (Second Bronston Aff. ¶ 3, Ex. A). Agreements must be approved by the Franchise and Concession Review Committee and by the Mayor. (Second Bronston Aff., Ex. A, § 6–03).

## II. *The Cable Services Provided By Liberty*

Liberty provides cable service in several different ways in the City, including the use of SMATV systems. (Price Aff. ¶ 3).[4] Liberty receives satellite and broadcast television signals at its "head end" facility on East 95th Street in Manhattan. (Price Aff. ¶ 5). These signals are processed and transmitted by microwave to reception antennae located on multiple unit buildings located throughout the greater metropolitan area. (Price Aff. ¶ 5). Liberty's reception antennae deliver cable service to building residents using one of three configurations. (Price Aff. ¶ 7).

The first type of system employed by Liberty is known as the "Stand Alone System" configuration. The Stand Alone System utilizes a single microwave reception antenna to deliver cable service to the residents of the single building where the antenna is located. (Price Aff. ¶ 8).

The second system used by Liberty, referred to as the "Common System" configuration, utilizes a single microwave reception antenna located on the roof of a multiple unit dwelling to deliver cable service to two or more proximate multiple unit buildings under common ownership, control or management. (Price Aff. ¶ 9). The building with the antenna is linked by coaxial cable to the other buildings, without using public property. (Price Aff. ¶ 9).

Under 47 U.S.C. § 522(7), Liberty's Stand Alone Systems and Common Systems are SMATV systems subject to the private cable exemption, not "cable systems." These two systems are classified as such because they meet the common ownership requirement set

---

**2.** A copy of Resolution 1639 can be found annexed to the Affidavit of John Grow executed January 30, 1995 ("Grow Aff.") at exhibit 10 and to the First Amended Complaint dated December 13, 1994 ("First Amd. Compl.") as exhibit E.

**3.** Reference is to the Supplemental Affidavit of David Bronston executed February 27, 1995 ("Second Bronston Aff.").

**4.** Reference is to the Affidavit of Peter O. Price executed December 20, 1994 (the "Price Aff.").

forth in that section and do not use the public right-of-way.

The third system used by Liberty, and the one in controversy here, is Liberty's "Non-Common System" configuration. With the Non-Common System, a single microwave reception antenna is located on the roof of a multiple unit dwelling to deliver service to two or more multiple unit dwellings. (Price Aff. ¶ 10). As with the Common Systems, the various buildings are linked with coaxial cable without using public property. *Id.* However, unlike Liberty's Common Systems, the Non-Common System links buildings which are *not* commonly owned, controlled, or managed. *Id.* Plaintiff Sixty Sutton is one such building. *Id.* The reception antenna that serves Sixty Sutton is located on River Tower, a building that is not commonly owned, managed, or controlled with Sixty Sutton. (Price Aff. ¶ 11). Liberty constructed its Non-Common Systems, including the system at Sixty Sutton, during the period from January 1993 to August 1994. (Price Aff. ¶ 12).

### III. *The Administrative Proceeding*

On or about May 31, 1994, the NYSCC received a complaint from Time Warner Cable of New York City ("Time Warner") and Paragon Cable Manhattan ("Paragon") which requested an investigation into how Liberty provided cable service in Manhattan. (Grow Aff., Ex. 1). Time Warner and Paragon, both traditional cable system operators, alleged that Liberty, which represents itself as an SMATV company, was actually improperly operating as a "cable operator," as defined by the Cable Act, without a franchise in violation of state and federal law. *Id.*

The NYSCC subsequently conducted an on-site investigation into Time Warner's charges against Liberty. Staff from the NYSCC conducted site inspections at two locations. At both locations, it was observed that a coaxial wire ran from one building to another, either across an alley or the rooftops of several other buildings. Each wire was also lashed to or ran alongside the wire

of a franchised cable company. (Grow Aff. ¶ 3, Ex. 3).

In a letter to the NYSCC dated June 28, 1994,[5] Liberty acknowledged that Liberty was running cables among residential buildings on the same block. Liberty stated that many—but not all—of these buildings were under common ownership, management, or control. Liberty argued, however, that it was the City's policy that a franchise was unnecessary where cables did not use or cross public property and that because Liberty's cables did not use or cross public property, Liberty did not require a franchise. Liberty also stated that it wired its serviced buildings in such a fashion in reliance on the City's policy. (Grow Aff., Ex. 2).

By Order to Show Cause dated August 23, 1994 (the "Order to Show Cause"),[6] the NYSCC directed Liberty to show cause by September 18, 1994, why it should not be determined to be a cable television system subject to the franchising and confirmation requirements of State law or, alternatively, why it should not be compelled to remove all interconnections by wire of buildings not commonly owned, controlled, or managed and be ordered to cease and desist from providing cable television services by means of such wires, until Liberty obtained a franchise and certificate of confirmation. The Order to Show Cause also provided that Liberty was entitled to be heard and present evidence relating to the allegations stated. (Grow Aff. ¶ 7, Ex. 3).

Liberty requested two extensions of time in which to respond to the Order to Show Cause, the first for a period of thirty days, extending Liberty's time to respond to October 19, 1994. (Grow Aff. ¶ 8, Ex. 4). The request was granted. (Grow Aff. ¶ 8, Ex. 5). Liberty's second request, made in a letter dated October 18, 1994, was for an extension of one hundred-eighty days. (Grow Aff. ¶ 9, Ex. 6). Liberty explained that the reason for the extension was that Liberty was engaged in discussions with DOITT about obtaining a franchise and agreed not to construct any new Non-Common Systems during the one

---

5. A copy of this letter is annexed to the Grow Aff. as exhibit 2.

6. A copy of the Order to Show Cause is annexed to the Grow Aff. as exhibit 3.

hundred-eighty day extension. *Id.* The NYSCC extended Liberty's time to respond to November 1, 1994. (Grow Aff. ¶ 9, Ex. 7). On October 31, 1994, Liberty filed its Answer and Appearance to the Order to Show Cause, again requesting an adjournment in order to negotiate with DOITT. (Grow Aff. ¶ 10, Ex. 9).

Liberty, meanwhile, sent a letter dated October 28, 1994, to DOITT expressing Liberty's interest in applying for a franchise pursuant to Resolution 1639. (Grow Aff. ¶ 10, Ex. 8). On October 31, 1994, DOITT informed the NYSCC that it was in receipt of Liberty's letter. (Grow Aff. ¶ 11, Ex. 10). DOITT stated that it expected to issue a Request For Proposals ("RFP")[7] within the next few months. *Id.*

On December 9, 1994, the first day of the administrative hearing, the NYSCC issued a standstill order (the "Standstill Order"). (Grow Aff. ¶ 12). The Standstill Order required that:

> there be no additional cable or closed transmission interconnections of buildings not commonly owned, controlled or managed and that in buildings where service was not currently being provided, that no new subscribers could be serviced through such hardware. Finally, Liberty was enjoined from energizing services at those buildings not commonly owned, controlled or managed presently connected by hard wire connecting that were not already energized.

(Grow Aff. ¶ 12, Ex. 11).

### IV. *Proceedings In This Court*

On December 8, 1994, before the Commission's hearing began, Liberty, Sixty Sutton, and Bud Holman[8] filed a complaint in this Court which was subsequently amended on December 13, 1994.[9] On December 22, 1994, the plaintiffs applied for a temporary restraining order and preliminary injunction enjoining the defendants from enforcing or attempting to enforce 47 U.S.C. §§ 522(7) and 541 so as to require Liberty either (i) to cease serving subscribers in Liberty cable systems which serve more than one multiple unit dwelling not under common ownership, control or management and which do not use any public property or rights-of-way, *i.e.,* Liberty's Non–Common Systems, or (ii) to obtain a City franchise as a condition of continuing to serve such Non–Common Systems. Liberty and Sixty Sutton also sought to enjoin defendants from continuing to enforce the Standstill Order. A temporary restraining order was granted which, by consent of the parties, was extended to and included March 10, 1995.

In the meantime, Time Warner and Paragon moved to intervene in this action as defendants. The motion to intervene was granted on February 14, 1995.[10]

■ The defendants have moved to dismiss the complaint on a variety of grounds, including ripeness and abstention. Extensive and useful oral argument was held on March 1, 1995 and March 3, 1995. For the reasons set forth below, defendants' motion to dismiss on the grounds of lack of ripeness is granted with respect to all of plaintiffs' claims except their equal protection claims; as to plaintiffs' equal protection claims, defendants' motions to dismiss are denied, and

---

7. An RFP is part of the standard minimum franchising procedures of 9 NYCRR, Part 594, promulgated by the NYSCC. (Grow Aff. ¶ 11).

8. Bud Holman, one of Liberty's subscribers and a resident of Sixty Sutton, (First Amd.Compl. ¶¶ 5–6), subsequently filed a notice of voluntary dismissal pursuant to Fed.R.Civ.P. 41(a) in this action.

Jack A. Veerman, another Liberty customer and a member of the Board of Directors of Sixty Sutton (Affidavit of Jack A. Veerman ("Veerman Aff.") executed February 17, 1995 at ¶¶ 1–2), later joined the litigation as a plaintiff.

9. The First Amended Complaint was later amended. A Second Amended Complaint was filed on February 21, 1995 ("Second Amd. Compl.").

10. Those parties demonstrated both "an interest relating to the property or transaction which is the subject of th[is] action and [that they are] so situated that the disposition of the action may as a practical matter impede or impair [their] ability to protect that interest" and that their interest is not adequately represented by existing parties, (Fed.R.Civ.P. 24(a)) and that one or more of their "claim[s] or defense[s] and the main action have a question of law or fact in common." (Fed. R.Civ.P. 24(b)).

plaintiffs' motion for a preliminary injunction is denied.[11]

## DISCUSSION

### I. Ripeness

■ The injunctive and declaratory remedies sought by Liberty and Sixty Sutton are "discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy 'ripe' for judicial resolution." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). Ripeness is a "constitutional prerequisite to exercise of jurisdiction by federal courts." *Federal Election Comm'n. v. Central Long Island Tax Reform Immediately Comm.*, 616 F.2d 45, 51 (2d Cir.1980) (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937)). The rationale behind the requirement of ripeness is:

> to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Abbott Laboratories*, 387 U.S. at 148–49, 87 S.Ct. at 1515. *See also Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 200–01, 103 S.Ct. 1713, 1720–21, 75 L.Ed.2d 752 (1983); *In re Drexel Burnham Lambert Group, Inc.*, 995 F.2d 1138, 1146 (2d Cir.1993). As the Court of Appeals put it, ripeness "turns on whether there are future events so contingent in nature that there is no certainty they will ever occur." *In re Drexel Burnham Lambert Group, Inc.*, 995 F.2d at 1146; *see also Amsat Cable v. Cablevision of Conn.*, 6 F.3d 867, 872 (2d Cir.1993).

■ In determining whether an issue is properly considered ripe for adjudication, courts are to conduct a two-pronged inquiry. First, a court must "evaluate ... the fitness of the issues for judicial decision." *Abbott Laboratories*, 387 U.S. at 149, 87 S.Ct. at 1515; *Amsat Cable*, 6 F.3d at 872; *In re Drexel Burnham Lambert Group, Inc.*, 995 F.2d at 1146. In determining whether issues are fit for review, a court must look to "whether the agency action is 'final'" and "whether the issue is purely legal or whether 'consideration of the underlying legal issues would necessarily be facilitated if they were raised in the context of a specific attempt to enforce the regulations.'" *In re Combustion Equip. Assocs., Inc.*, 838 F.2d 35, 37–38 (2d Cir.1988) (quoting *Gardner v. Toilet Goods Assoc.*, 387 U.S. 167, 171, 87 S.Ct. 1526, 1528, 18 L.Ed.2d 704 (1967)). The second factor a court must look to in determining whether an

11. It is well-established that when considering a motion to dismiss based on lack of jurisdiction, a court may consider matters outside the pleadings. *See, e.g., Land v. Dollar*, 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 1011 n. 4, 91 L.Ed. 1209 (1947) (stating that when a question of the district court's jurisdiction is raised, "the court may inquire by affidavits or otherwise, into the facts as they exist"); *Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir.1991) (noting that affidavits may be considered in deciding a motion pursuant to Fed.R.Civ.P. 12(b)(2)); *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir.1988) (rejecting the argument that the district court's dismissal pursuant to Fed.R.Civ.P. 12(b)(1) should be treated as a summary judgment motion where the court considered matters outside the pleadings; "where considering a motion to dismiss pursuant to Rule 12(b)(1), the district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction"), *cert. denied*, 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989); *Alfadda v. Fenn*, 751 F.Supp. 1114, 1118 (S.D.N.Y.1990) (stating that a court may resolve factual disputes when a party moves to dismiss for lack of subject matter jurisdiction), *rev'd on other grounds*, 935 F.2d 475 (2d Cir.), *cert. denied*, 502 U.S. 1005, 112 S.Ct. 638, 116 L.Ed.2d 656 (1991); *L'Europeenne de Banque v. La Republica de Venezuela*, 700 F.Supp. 114, 119 n. 6 (S.D.N.Y.1988) (stating that on a motion to dismiss for lack of jurisdiction, the court may look to affidavits as well as to the pleadings); *Loria & Weinhaus, Inc. v. H.R. Kaminsky & Sons, Inc.*, 80 F.R.D. 494, 497–98 (S.D.N.Y.1978) (noting that the pleadings and affidavits may be considered when determining whether to grant a motion to dismiss for lack of personal jurisdiction). Ripeness is a prerequisite to the exercise of jurisdiction by federal courts. *See, e.g., Federal Election Comm'n v. Central Long Island Tax Reform Immediately Comm.*, 616 F.2d 45, 51 (2d Cir.1980). Consequently, despite my consideration of the affidavits and various materials outside the pleadings submitted by the parties, this motion is properly considered as a motion to dismiss.

issue is ripe is "the hardship to the parties of withholding court consideration." *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515; *Amsat Cable,* 6 F.3d at 872; *In re Drexel Burnham Lambert Group, Inc.,* 995 F.2d at 1146.

### A. *Liberty's Claims*

#### 1. *First Amendment*

In its first claim for relief, Liberty (as well as Sixty Sutton and Veerman) challenge certain provisions of the Cable Act, in particular, 47 U.S.C. § 522(7), which defines Liberty's Non–Common System as a "cable system", and 47 U.S.C. § 541(b), which imposes the franchising requirement on cable systems. (Second Amd.Compl. ¶¶ 71–75). Plaintiffs claim that the imposition of a franchise requirement on Liberty's Non–Common Systems, including the Non–Common System at Sixty Sutton, "prevents, burdens, violates and interferes with Plaintiff's [sic] rights to engage in protected speech activity on private property in violation of the First Amendment to the United States Constitution." (Second Amd.Compl. ¶ 74). Plaintiffs assert that these two provisions are invalid both facially and as applied to the Non–Common Systems which do not utilize public property or rights of way. (Second Amd. Compl. ¶ 75).

The defendants have moved to dismiss plaintiffs' challenge to the Cable Act as unripe. The defendants rely heavily on *Beach I,* 959 F.2d 975, and argue that no meaningful distinction can be drawn between *Beach I* and the instant case.

In *Beach I,* the petitioners were SMATV companies that brought a facial challenge to the Cable Act's requirement, as interpreted by the Federal Communications Commission (the "FCC"), that "external, quasi-private" SMATV facilities be franchised. *Id.* at 980. The Court of Appeals for the District of Columbia Circuit explained that this type of facility was "a SMATV facility with wires or other closed transmission paths interconnecting separately-owned, controlled and managed multiple-unit dwellings, without those wires using public rights-of-way," *id.,* a definition which exactly describes Liberty's Non–Common System. The petitioners argued that the FCC incorrectly interpreted the definition of "cable system" to cover external, quasi-private SMATV, and that this definition violated their First Amendment and Equal Protection rights by requiring them to obtain local franchises. *Id.*

In considering whether plaintiffs' claims were ripe, the Court of Appeals noted that the obligations imposed by the Cable Act were not "fully defined" and thus were impossible to evaluate. *Id.* at 983. It was because of this uncertainty about the nature of the duty that a local franchising system might impose and because "the justification for that duty will depend on local facts" that the Court held that petitioners' First Amendment challenge was not yet ripe. *Id.* at 984. As the Court put it:

> We cannot find the statute unconstitutional on its face because we do not know whether conditions in any given locality will justify a burden on petitioners' speech, nor do we know what kind of burden will need to be justified, nor the appropriate First Amendment standard. Thus, we cannot assess any claim of First Amendment infringement absent an as-applied challenge to some specific franchising requirement.

*Id.* at 976.

In reaching this conclusion, the Court applied the twofold inquiry articulated in *Abbott Laboratories,* 387 U.S. at 136, 87 S.Ct. at 1507. With respect to the "fitness" inquiry, the Court explained that judicial review of a First Amendment issue is "likely to stand on a much surer footing in the context of a specific application of [the FCC's Cable Definition Rule] than could be the case in the framework of the generalized challenge made here." *Beach I,* 959 F.2d at 984 (citing *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 164, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967)). Consequently, the Court ruled, it was beneficial to postpone its review of petitioners' facial challenge until there was an as-applied challenge. *Id.* As the Court explained:

> Different regimes will impose different burdens, which may or may not be justifiable under the First Amendment. Moreover, the judicial standard for evaluating

the justification will vary with the regime. . . . A particular local franchising system may impose only an "incidental" burden on the speech of SMATV operators . . . [or] may impose "direct" burdens that require stricter First Amendment scrutiny.

*Id.* (citations omitted). In addition, the Court noted that a "court reviewing an as-applied challenge will have specific information about the local conditions that might justify SMATV franchising." *Id.*

The second prong of the *Abbott Laboratories* test is, of course, "hardship to the parties of withholding review." *Id.* at 985. The *Beach I* Court explained that:

"The paradigmatic hardship situation is where a petitioner is put to the choice between incurring substantial costs to comply with allegedly unlawful agency regulations and risking serious penalties for noncompliance."

959 F.2d at 985 (quoting *Natural Resources Defense Council v. E.P.A.*, 859 F.2d 156, 166 (D.C.Cir.1988)). Applying this standard to the situation in *Beach I*, the Court noted first that if the petitioners did not comply with the

challenged regulations, the petitioners might face civil, or even criminal, penalties. *Id.* The Court then discussed, however, that it was "unclear" whether the petitioners would incur "substantial" costs by complying with the statute and the local franchising scheme. *Id.* In addition, the Court also noted that the choice between compliance and the risk of enforcement could be avoided by bringing an "anticipatory, as-applied challenge," *id.*, which I take to mean a challenge to a particular known burden, as opposed to an attack on the facial validity of the statute.[12]

#### a. *Fitness for Judicial Decision*

The *Beach I* analysis addresses a situation virtually identical to the instant action. With respect to fitness for judicial review, the *Beach I* Court's analysis is exactly on point. Liberty has not yet applied for a franchise from DOITT, and neither the NYSCC nor DOITT has taken any final action with respect to Liberty; in fact, perhaps it is more accurate to say that these agencies have just begun to address Liberty.[13] Also as in *Beach I*, Liberty cannot identify what burdens the franchising scheme might impose after weighing, *inter alia*, Liberty's non-tra-

---

12. This interpretation is supported by the Court's earlier comment that it could not "assess any claim of First Amendment fringement absent an as-applied challenge *to some specific franchising requirement.*" *Id.* at 976 (emphasis added).

13. By means of comparison, it is instructive to consider *City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986), *appealed after remand*, 13 F.3d 1327 (9th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 2738, 129 L.Ed.2d 859 (1994). In *Preferred Communications*, a cable company sued the City of Los Angeles and the Department of Water and Power ("DWP") alleging violation of its rights under the First and Fourteenth Amendment and under §§ 1 and 2 of the Sherman Act by the City's refusal to grant it a cable television franchise and by the DWP's refusal to grant access to DWP's poles or underground conduits used for power lines. *Id.* at 490, 106 S.Ct. at 2035. The Court of Appeals for the Ninth Circuit affirmed the dismissal of the antitrust claims, but reversed the dismissal of the First Amendment Claim. *Id.* at 491, 106 S.Ct. at 2036. The Supreme Court agreed that the First Amendment claim should not have been dismissed, but was "unwilling to decide the legal questions posed by the parties without a more thoroughly developed record of proceedings in which the parties have an opportunity to prove those disputed factual assertions upon which they rely." *Id.* at 494,

106 S.Ct. at 2037. Thus, even in *Preferred Communications*, where final agency action had been taken, *i.e.*, the City had refused to grant a cable franchise, the Supreme Court found the legal questions raised were not appropriately addressed at that time.

On remand, the Ninth Circuit was unwilling to adjudicate the cable company's First Amendment challenges to the City's franchising scheme until the City issued another request for proposals and the cable company was given the opportunity to apply and compete for a franchise. 13 F.3d 1327, 1332-33 (9th Cir.1994). In that way, it could be determined whether the cable company was "ready, willing and able" to operate a cable system, whether it had the appropriate qualifications, and what the terms of the franchise might be. *Id.* The Court explained that:

Since there are so many ways we might well avoid having to confront these difficult constitutional issues, it would be precipitous of us to try to reach them at this time. Were we to try, we would have to "decide the legal questions posed by the parties without a more thoroughly developed record . . . ," something the Supreme Court refused to do when reviewing our last opinion. If we failed to follow the Court's example, "we would not escape the charge of rendering advisory opinions poorly disguised as sweeping dicta."

*Id.* at 1333 (citations omitted).

ditional method of transmission and the technical limitations attendant thereto.[14] Many of the burdens are permissive rather than mandatory (*e.g.*, 47 U.S.C. § 545(a)(1) which allows cable operators to displace local franchising requirements relating to educational equipment obligations upon a demonstration of commercial impracticality), are graduated according to the number of channels delivered by the cable operator (*e.g.*, 47 U.S.C. § 534(b)(1) which requires a cable system with 12 or fewer channels to carry at least three local commercial stations and a cable system with more than 12 channels to carry local commercial stations on up to one-third of its channels; 9 NYCRR, part 595.4(b) which provides similarly graduated require-ments with respect to public, educational or governmental ("PEG") access channels) or set limits that benefit prospective cable oper-ators (*e.g.*, 47 U.S.C. § 542(b) which provides a 5% cap on franchise fees but which does not prevent a municipality from accepting less). There is no way to know at this time what the ultimate mix of burdens might be. Also as in *Beach I*, 959 F.2d at 984, because we do not know the precise nature of the burdens imposed, it cannot be said what the appropriate level of scrutiny might be with which to evaluate plaintiffs' First Amendment challenge.[15] The factual record has simply not reached a stage of development at which these difficult questions are appropriately addressed.[16]

---

**14.** I note that Martin Schwartz, counsel for Time Warner, pointed out on March 1, 1995 at argument that the burdens of a franchise initially proposed by DOITT tend to differ markedly from the eventual franchise which results from extended negotiations between DOITT and the cable operator. As Mr. Schwartz explained:

> I can tell you that the end product usually looks a lot different from the city's initial proposal. So that goes to the question as to whether this rule making which invites comments is going to be similar or identical to what ultimately eventuates. I would suggest that there is a great deal to be determined in terms of what the terms would be for several reasons.

(Transcript of oral argument held March 1, 1995 and March 3, 1995 ("Tr.") at 47). Lewis Finkelman, counsel for the City, also explained that:

> [T]hese are proposed rules.... Liberty is free to comment to point out why some of these conditions are not appropriate to a system like theirs. That's the whole point of this proposed rule making process, so the city can get input. We have never given a franchise like this. There are many issues that obviously are going to be troublesome that we want comments from interested parties on and are willing to hear them in order to determine what the provisions should be of the franchise agreement.
>
> It certainly is not a given [that the terms and conditions of the franchise finally authorized will be the same as those in the New Rulemaking]. And this is why, with respect to this process, it is certainly not a ripe challenge at this point.

(Tr. at 35–36).

**15.** For example, in *Turner Broadcasting Sys. v. Federal Communications Comm'n*, —— U.S. ——, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994), the Supreme Court decided that "the appropriate standard by which to evaluate the constitutionality of must-carry is the intermediate level of scru-tiny applicable to content-neutral restrictions that impose an incidental burden on speech." On the other hand, a less rigorous standard is applicable to broadcast medium due to the "unique physical limitations of the broadcast medium." *Id.* at ——, 114 S.Ct. at 2456; *see, e.g., Red Lion Broadcasting Co. v. Federal Communications Comm'n*, 395 U.S. 367, 388–90, 89 S.Ct. 1794, 1805–07, 23 L.Ed.2d 371 (1969); *New York Citizens Comm. on Cable TV v. Manhattan Cable TV*, 651 F.Supp. 802, 817–18 (S.D.N.Y.1986) (explaining that "differences among the various modes of communication justify differences in the First Amendment standards applied to them" and declining to decide what standard of review should apply to cable television "without more facts about cable television").

**16.** I note that several of the items which Veerman and Sixty Sutton contend require discovery so "that the factual record [can] be sufficiently developed to allow meaningful appellate review" (MacNaughton March 8, 1995 letter, p. 1) are exactly the issues that one would expect a franchising authority to consider during the franchising process, *e.g.*:

> The specific policies and practices of the "must-carry stations" that would be implemented if Liberty were required to have a franchise. This would establish the specific number of channels that Jack A. Veerman and Sixty Sutton Corp. will lose if the franchise requirement is imposed on Liberty.
>
> \*　\*　\*　\*　\*　\*
>
> The specific construction costs for building a cable television system in Community District 6 where the Sutton Building is located.
>
> \*　\*　\*　\*　\*　\*.
>
> The specific burdens of complying with the mandatory federal standards for ... rate regulation pursuant to 47 U.S.C. § 593.
>
> \*　\*　\*　\*　\*　\*
>
> The specific burdens of complying with mandatory state standards for ... PEG channels pursuant to 9 N.Y.C.R.R. § 595.4.

### b. *Hardship of Withholding Court Consideration*

Turning to the question of the hardship to the parties, as was true of the petitioners in *Beach I,* it cannot be said on the facts currently in the record that any particular hardship will befall the plaintiffs if judicial decision-making is withheld for now. First, in the instant case, it is as yet unknown what the "costs of compliance," 959 F.2d at 985, with the local franchising scheme might be—given that the franchising process is on-going (*See, e.g.,* Second Bronson Aff. ¶¶ 1–3, Ex. A). I do note, however, that the time periods set for the initial steps toward a franchise are relatively short and, therefore, that any delay on account of the franchising process may well be brief. *Id.* Second, the analogy to the risk of "serious penalties", *id.,* is, presumably, the threat that Liberty's cable service will be interrupted.[17] However, whether the defendants will exercise their regulatory authority in such a way as to impinge upon the constitutional rights of the plaintiffs simply cannot be ascertained as yet.[18]

In addition, to the extent that any hardship might accrue to Liberty because of interruption to the Non–Common Systems it currently services or is ready to service, that hardship is of Liberty's own making. Liberty constructed its Non–Common Systems, including the system serving Sixty Sutton, from January 1993 to August 1994. (Price Aff. ¶ 12). Liberty did not, however, express any interest in obtaining a franchise from the City until October 28, 1994, several months after the NYSCC issued its Order to Show Cause. (Grow Aff. ¶¶ 7, 10, Ex. 8).

Liberty proffers a variety of reasons for its delay. First, Liberty asserts that it constructed its Non–Common Systems in reliance on alleged NYSCC and DOITT "policy" that a cable system which did not use City property or public rights-of-way did not qualify for and was not required to obtain a franchise. (Price Aff. ¶ 12). Liberty points to a April 27, 1992 letter from DOITT advising the Russian American Broadcasting Company ("RABC") that it did not need a franchise from the City to provide service because there was no proposed use of the inalienable property of the City. (Price Aff. ¶¶ 12–13; First Amd.Compl., Ex. C). Liberty also claims that its President, Mr. Price, met with William Squadron, then DOITT's Commissioner, and Christopher Collins, then General Counsel, in mid-March 1992. (Price Aff. ¶ 14). Mr. Price claims that Mr. Squadron and Mr. Collins stated to him that Liberty did not need a franchise so long as no City property or rights-of-way were used. (Price Aff. ¶ 14). However, both Mr. Squadron and Mr. Collins have entirely different recollections of this meeting. They state that the issue of Liberty's operating Non–Common Systems was not discussed at the meeting, and that they both understood Liberty to employ service via microwave transmission, not via wire. (Collins Aff. ¶¶ 3–4;[19] Squad-

---

Letter of W. James MacNaughton, Esq., dated March 8, 1995.

**17.** As W. James MacNaughton, counsel for Sixty Sutton and Veerman, colorfully put it: "the sword of [D]amocles and an order to show cause ... [are] about to chop those wires." (Tr. at 109).

**18.** The State has pointed out that the outcome of the administrative proceedings commenced—but temporarily halted—against Liberty should not be presumed:

In the administrative proceeding before the [NYSCC], Liberty will be provided a complete and full opportunity to present evidence to support the exempt status of any locations that are commonly owned, controlled or managed. Contrary to Liberty's claims in its Amended Complaint at Paragraphs 65–66, its service to subscribers will not necessarily be terminated. It is also not true that the [NYSCC] will necessarily order Liberty to sever connecting cable, or pay fines or sanctions. Merely because the Standstill Order has been issued does not mean that the Commission has issued a final determination in this matter. In at least one prior case in which the [NYSCC] issued an Order to Show Cause against a system that served a condominium development, a Cease and Desist Order was not issued for one year. Even then, the [NYSCC] allowed the operator to apply for a franchise, which it did. The franchise was granted, and *there was no interruption in service.*

(Grow Aff. ¶ 32) (emphasis added).

**19.** Reference is to the Affidavit of Christopher Collins executed January 30, 1995. Collins states that at the meeting with Mr. Price:

Mr. Price described to us [Collins and Squadron] a system which contemplated service to

ron Aff. ¶ 3).[20]  Each also states unequivocally that Liberty never asked him or anyone else whether a franchise was required by the City. (Collins Aff. ¶ 5; Squadron Aff. ¶ 4). Given that the accounts of what happened at this meeting are flatly contradictory, I do not rely on either plaintiffs' or defendants' account of this meeting.

But, assuming *arguendo* that first, Liberty relied on the letter to the RABC, second, that such reliance was somehow reasonable,[21] and third, that government employees can waive the requirements imposed by law,[22]

> multiple buildings via microwave transmissions, not via wire. Since my understanding at that time was that Liberty's system exclusively employed microwave transmission between buildings, I can unequivocally aver that I did not make the statement Mr. Price has attributed to me.
> (Collins Aff. ¶ 4).

20.  Reference is to the Affidavit of William F. Squadron executed January 30, 1995. Squadron states in part that:

> The installation which we inspected during that meeting was a single satellite reception antenna delivering cable television service to the residents of a single building, and Liberty's system, as described to us by Mr. Price, contemplated service to multiple buildings via microwave transmission, not via wire. I could not have stated that a "Non–Common System" operated by Liberty would not require a franchise because my understanding, then, and throughout my tenure, was that Liberty's system exclusively employed microwave transmission between buildings.
> (Squadron Aff. ¶ 3).

21.  According to the NYSCC, RABC provides services in a manner quite different from the way in which Liberty does.

> The original proposal by RABC was to provide a single channel of Russian language programming, which had been initially made available via transmission over-the-air and which the company also wished to provide through wire or coaxial cable.
> In contrast to the service provided by RABC, the service Liberty seeks to provide is a multi-channel service that includes the capacity to distribute as many as 72 channels. This service would be provided by wire or coaxial cable.... RABC's service is thus substantially different from the sort of service that Liberty seeks to provide.
> (Grow Aff. ¶¶ 18–19).

22.  Under New York law, Liberty has no legal basis for relying on the RABC letter. *See, e.g.,*

this still does not explain why Liberty failed to approach DOITT and ask for a franchise. In addition, since January 1993, Liberty by its own admission has operated "cable systems" and is a "cable operator" required by the Cable Act to have a franchise. (Jacobs Aff. ¶ 7;[23]  First Amd.Compl. ¶¶ 30–31). Furthermore, on June 1, 1993, the Supreme Court held in *Beach III* that SMATV operators which interconnect separately owned, controlled and managed buildings with cable were subject to the Cable Act, even if such cable is solely on private property.[24]  Liberty

*Genesco Entertainment v. Koch,* 593 F.Supp. 743, 749 (S.D.N.Y.1984) (stating that "the New York courts do not generally follow the doctrine of apparent authority in cases involving municipal defendants"). The District Court noted that, "New York places the burden of determining the scope of a municipal officer's authority upon those who deal with municipal government." *Id.* The Court explained that:

> Where the Legislature provides that valid contracts may be made only by specified officers or boards and in specified manner, no implied contract to pay for benefits furnished by a person under an agreement which is invalid because it fails to comply with statutory restrictions and inhibitions can create an obligation or liability of the city. In similar case [sic] this court has given emphatic warnings that equitable powers of the courts may not be invoked to sanction disregard of statutory safeguards and restrictions.

*Id.* at 750 (quoting *Seif v. City of Long Beach,* 286 N.Y. 382, 387–88, 36 N.E.2d 630, 632 (1941)). *See also Restatement Second of Agency* § 167 comment c (1958).

23.  Reference is to the Affidavit of Robert S. Jacobs executed on January 13, 1995.

24.  The issue facing the Supreme Court was whether there was a rational basis that justified the distinction between cable facilities serving separately owned and managed buildings and those serving one or more buildings under common ownership or management. *Id.* at ——, 113 S.Ct. at 2099. The Court concluded that the common-ownership distinction was constitutional. *Id.* at ——, 113 S.Ct. at 2102. The Court noted that the Court of Appeals "evidently believed that the crossing or use of a public right-of-way is the only conceivable basis upon which Congress could rationally require local franchising of SMATV systems," *id.* at ——, 113 S.Ct. at 2104, but the Supreme Court held, to the contrary, that "there are plausible rationales unrelated to the use of public rights-of-way for regulating cable facilities serving separately owned and managed buildings." *Id.*

clearly knew of this development in the law.[25] However, as noted above, Liberty did not contact the City with respect to a franchise until October 1994, after the NYSCC issued its Order to Show Cause, and even then, it was in a single-sentence letter stating only that Liberty was "interested in applying for a cable television franchise pursuant to the Resolution No. 1639 and applicable federal law." (Grow Aff. ¶¶ 7, 10, Ex. 8). Particularly in light of the *Beach III* decision, there is no satisfactory explanation as to why Liberty did not request a franchise promptly after June 1, 1993.[26]

Finally, any claim by Liberty that it will suffer hardship during the pendency of the franchising process is undercut by its requests for a thirty-day extension of time in which to answer the Order to Show Cause (Grow Aff. ¶ 8, Ex. 4) and later a one hundred-eighty day adjournment during which it agreed not to construct any new Non–Common Systems (Grow Aff. ¶ 10, Ex. 6).

On the other hand, a substantial hardship will be imposed on NYSCC and DOITT if plaintiffs are permitted to proceed in this Court because those agencies' ongoing proceedings on this very issue will be interfered with. Since the ripeness doctrine is intended not only to protect courts from premature adjudication, but also to "protect the Agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties," *Abbott Laboratories,* 387 U.S. at 148–149, 87 S.Ct. at 1515, this hardship must be weighed heavily. *See also Payne Enters. v. United States,* 837 F.2d 486, 493 (D.C.Cir.1988) ("under the ripeness doctrine, the hardship prong of the *Abbott Laboratories* test is not an independent requirement divorced from the consideration of the institutional interests of the court and agency").

On balance, I find that it would be inappropriate to exercise judicial decision-making power at this time on these issues. *See, e.g., Daley v. Weinberger,* 400 F.Supp. 1288, 1291 (E.D.N.Y.1975) (holding that physician's claims for declaratory and injunctive relief to prevent the FDA from inspecting her office not yet ripe where there was "no final agency action whose legality the court may pass upon" and noting that the "court is reluctant to anticipate what future action, if any, FDA may decide to take"), *aff'd,* 536 F.2d 519 (2d Cir.1976), *cert. denied,* 430 U.S. 930, 97 S.Ct. 1548, 51 L.Ed.2d 773 (1977).[27]

**25.** In fact, Liberty wrote to the FCC on April 7, 1992 urging the FCC in no uncertain terms to defend the definition of "cable system" against the constitutional challenges brought by the *Beach* petitioners. (Jacobs Aff. ¶ 9; Ex. T).

**26.** *See, e.g., Conn. State Federation of Teachers v. Board of Educ. Members,* 538 F.2d 471 (2d Cir. 1976). In that case, plaintiffs were teachers' local unions who alleged a deprivation of their First and Fourteenth Amendment rights. *Id.* at 475. Plaintiffs complained that, among other things, "as a matter of school board policy", the majority teachers' union was given access to school facilities for its meetings, but that other groups had to "apply" to a designated official for permission to use the facilities. The Court noted that the plaintiffs had failed to allege that the local had ever requested permission to use the school facilities for a meeting; that such a request was denied; or, that if a request had been denied, it was denied for a constitutionally impermissible reason. *Id.* The Court went on to say that:

> If the [plaintiffs' local] is given permission freely to hold its meetings in school facilities (and we will not assume, absent specific allegations, that the ... defendants engage in unconstitutional conduct in this respect) the "difficulty"

involved in requesting this permission from the designated official hardly can be considered an infringement on the First Amendment rights of [the local's] members.

*Id.*

**27.** The situation facing the plaintiffs in the instant case can thus be distinguished from, *e.g.,* that facing the plaintiff in *Amico v. New Castle County,* 553 F.Supp. 738 (D.Del.1982), *aff'd,* 770 F.2d 1066 (3d Cir.1985). There, plaintiff, who sought to open an adult entertainment center, contended that a county ordinance restricting where such facilities could be established impermissibly burdened his First Amendment rights, and the defendant moved to dismiss based, in part, upon ripeness. *Id.* at 739. The defendant argued that the case was not yet ripe because the plaintiff had not provided the county with information requested by the county without which, the county claimed, it could not make a final determination of plaintiff's application for his center. *Id.* at 742. Without that final determination, the county argued, the case was not ripe. *Id.* The Court rejected this argument. First, the Court pointed out that the county had not been able to specify what information it sought. *Id.* at 742–43. Second, and more importantly, the Court stated that it was "clear" that the county

Despite Liberty's April 7, 1992 submission to the FCC agreeing that "the [Beach] Petitioners' claims of oppressive regulation are not yet ripe for decision" (Jacobs Aff., Ex. T at 2), plaintiffs contend that *Beach I* is inapposite. First, Liberty points to the Standstill Order, which forecloses Liberty from establishing Non–Commons Systems service to a number of buildings to which Liberty would otherwise commence the process of establishing cable service. Liberty claims that at that moment when Liberty is foreclosed from hooking up these other buildings, Liberty is harmed concretely enough to demonstrate that the action is ripe. However, Liberty's situation is in this regard no different from the situation facing the *Beach* petitioners. In *Beach I,* the Court noted that "[p]etitioners have standing because they currently operate external, quasi-private SMATV facilities or have concrete plans to operate such facilities." 959 F.2d at 980 n. 6. Thus, the fact that Liberty is providing cable service to subscribers and may have potential subscribers does not distinguish the ripeness of Liberty's claims from those of the *Beach* petitioners who also operated or had plans to operate SMATV facilities identical to Liberty's.

Second, Liberty attempts to distinguish *Beach* on the ground that the burdens which Liberty allegedly faces are more concretely known here. However, with respect to the burdens which might be imposed by the franchise, Liberty's situation differs little from that of the petitioners in *Beach.* As the *Beach I* Court put it:

The Cable Act creates a franchise requirement, but gives localities broad discretion to determine the substance and process of franchising. The Act permits but does not require exclusive franchising.... Similarly, the Act does not generally require that localities impose special duties on franchisees, but simply permits localities to regulate cable rates, set aside public channels, or levy a franchise fee. And, in general, the statute gives only minimum specifications for the franchising procedures. In short, a locality could adopt a summary process for franchising every external, quasi-private SMATV facility, and local SMATV operators could discharge their ... obligation by complying with this process. Such a franchising regime would pose very different First Amendment problems than a costly, exclusive-franchising system.

*Id.* at 983–84 (citations omitted). It is because of the degree of discretion given to the local franchising authorities that it cannot be said with assurance what the burdens of a franchise awarded by DOITT might be for Liberty. In fact, Liberty itself recognizes that all of the burdens it may face are not yet known. (Liberty's Reply Mem. of Law in Supp. of Pls.' Mot. for a Prelim.Inj. at 32; Tr. at 58).

Liberty contends, however, that its dispute is ripe with respect to a number of "mandatory" burdens, that is, burdens which Liberty says are required to be imposed on it directly through federal regulation and which thus

---

was not going to grant the plaintiff the necessary certificate of compliance. *Id.* at 743. This argument is inapplicable to the instant case, where it simply cannot be said that the City is going to deny Liberty a cable franchise.

*Triple G Landfills v. Board of Comm'rs of Fountain County,* 977 F.2d 287 (7th Cir.1992) is inapplicable for similar reasons. In that case, plaintiff sought a declaration that a county ordinance regulating the development of landfills was impermissible under federal and state law. *Id.* at 288. The County argued that the case was not ripe because Triple G had not yet applied for a state permit, the implication of which was that Triple G could not yet apply for a county permit, and so Triple G did not face an immediate threat of enforcement. *Id.* at 290. The Court found, however, that the case was ripe for reasons simi-

lar to those in *Amico,* namely, that the outcome was, in effect, predetermined:

Given the virtually preclusive effect of the ordinance at the county level, there would be no point in requiring Triple G to engage in a state permitting process—a process that the County itself admits is "withering and expensive." ... The ripeness doctrine requires a live, focused case of real consequence to the parties. It does not require Triple G to jump through a series of hoops, the last of which it is certain to find obstructed by a brick wall.

*Id.* at 290–91. It cannot be said here that Liberty is certain to meet a brick wall in the franchising process. In addition, the *Triple G* Court noted that that case involved "purely legal" issues, *id.* at 289, whereas the instant case is fact-intensive.

are now known. (Third Price Aff. ¶ 8).[28] As Liberty explained,

> If by operation of the challenged common-ownership requirement Liberty is subject to the mandatory minimum obligations imposed on a cable system, these obligations will include certain channel allocation requirements. Among these mandatory channel allocation requirements are "must-carry", *see,* 47 U.S.C. §§ 534 and 535, "leased access", *see,* 47 U.S.C. § 532, and public, educational and government ("PEG") channels, *see,* 47 U.S.C. § 531, Executive Law § 829(3) and 9 N.Y.C.R.R. § 595.

(Third Price Aff. ¶ 8). However, these requirements are the same as those that faced the petitioners in *Beach.* The *Beach* petitioners' "external quasi-private SMATV" is identical to Liberty's Non–Common System, and they faced precisely the same regulatory framework.

In addition, on the face of its pleading, Liberty is challenging the constitutionality of §§ 522(7) and 541(b),[29] that is, the definition of a cable system and the franchising requirement imposed on such cable systems. With the franchising requirement, however, comes not only burdens but benefits, for example, the five percent cap on franchise fees contained in 47 U.S.C. § 542(b). Because the Second Amended Complaint is directed to the entire franchising requirement, such benefits are also subject to plaintiffs' challenge. The challenge in the Second Amended Complaint is *not* limited to a challenge of one or more of the mandatory burdens imposed,[30] and, indeed, certain such challenges could not be brought in this court.[31] Thus, plaintiffs' efforts to distinguish themselves from *Beach* by this method are unavailing.[32]

In short, defendants' motion to dismiss is granted with respect to Liberty's first cause of action.

**28.** Reference is made to the Affidavit of Peter O. Price executed on March 3, 1995.

**29.** For example, in Liberty's first claim for relief, Liberty challenges the constitutionality of 47 U.S.C. §§ 522(7) and 541(b). (Second Amd. Compl. ¶¶ 71–75). Read together, these two sections impose the local franchising requirement, not mandatory federal burdens. The gravamen of the second and third claims is that Liberty was prohibited to operate its Non–Common Systems without a franchise, but DOITT did not provide for issuance of a franchise to this type of system. (Second Amd.Compl. ¶¶ 78, 81). The fourth, fifth, and sixth claims assert equal protection claims. (Second Amd.Compl. ¶¶ 84, 88). The sixth claim also asserts a Due Process claim. (Second Amd.Compl. ¶ 90). There is nothing in the rest of the claims asserted by Liberty even remotely susceptible of being interpreted as a challenge to mandatory federal burdens. (Second Amd.Compl. ¶¶ 92, 96, 99, 101, 104, 106). At no point in the pleadings does Liberty enumerate the particular burdens directly imposed by the Cable Act that it opposes. I also note that Liberty did not name the United States as a defendant.

**30.** Liberty's challenge is different from a facial constitutional challenge to a particular aspect of the federal regulations. For example, the cable industry has challenged eleven provisions of the Cable Television Consumer Protection and Competition Act of 1992 and to two provisions of the Cable Communications Policy Act of 1984. *See Daniels Cablevision v. United States,* 835 F.Supp.

1, 3 n. 1 (D.C.Cir.1993), *appeal docketed sub nom. Time Warner Entertainment Co. v. United States,* D.C.Cir., No. 93–5349. In that litigation, the plaintiffs challenged various provisions individually, including rate regulation; must-carry; public access channels; limitations on ownership, control and utilization; vertically integrated programmers; public, educational and government access; and leased access. *Id.*

**31.** For example, the constitutionality of the "must-carry" requirements set forth in 47 U.S.C. §§ 534 and 535 may only be heard by a district court of three judges convened pursuant to 28 U.S.C. § 2284. 47 U.S.C. 555(c)(1). I also note that the Supreme Court has addressed the constitutionality of the must-carry rules in *Turner Broadcasting Sys. v. F.C.C.,* — U.S. —, —, —, 114 S.Ct. 2445, 2469, 2472, 129 L.Ed.2d 497 (analyzing the must-carry rules under intermediate-level scrutiny and remanding in order to develop a more thorough factual record), *reh'g denied,* — U.S. —, 115 S.Ct. 30, 129 L.Ed.2d 927 (1994).

**32.** I also note the comment of the *Beach* court at 985: "Moreover, it is possible that petitioners might avoid the Hobson's choice between compliance and the risk of enforcement by bringing an anticipatory, as-applied challenge." The implication of this language is that a challenge more likely to be found ripe for adjudication would be a challenge to a particular burden which is going to be imposed, and not merely a broad attack upon the Cable Act itself.

### 2. Due Process

In its third cause of action, Liberty alleges that:

Defendants' conduct which, *inter alia*, includes the prohibition of Liberty's operation of the Non–Common Systems without a franchise, and failure to provide the terms and conditions for issuance of a franchise to cable systems which do not use public property or rights-of-way, prevents, burdens, violates and interferes with Liberty's rights to engage in protected speech activity on private property in violation of the First Amendment.

(Second Amd.Compl. ¶ 81). The gravamen of Liberty's claim was that Federal and State regulations required Liberty to obtain a franchise, but that DOITT did not provide franchises for cable systems such as Liberty's. This dilemma apparently constitutes the facts upon which plaintiffs rely on their sixth cause of action where they assert that "[d]efendants' conduct constitutes a denial of Plaintiffs' right to due process and equal protection in violation of the Fourteenth Amendment to the United States Constitution" (Second Amd.Compl. ¶ 90), and their eighth cause of action where they complain of Resolution 1639 as clearly inapplicable (ignoring Executive Law § 819(2)), vague and investing the City with boundless discretion—all in violation of plaintiffs' due process rights (Second Amd.Compl. ¶¶ 94–96).

The dilemma that Liberty faced when it filed its original complaint—of being required to obtain a license to operate yet having nowhere to go to obtain one—is not the current situation; the facts upon which plaintiffs relied in pleading these claims originally have changed.

It is undisputed that on February 24, 1995, DOITT published a notice of rulemaking regarding solicitations for franchises for the provision of cable service such as Liberty's, *i.e.*, cable service which does not use the inalienable property of the City. (Second Bronston Aff. ¶¶ 1–2, Ex. A). According to DOITT, the rulemaking process is proceeding in accordance with the City Administrative Procedure Act. (Second Bronston Aff. ¶ 2). As part of this process, the public written comment period for the proposed rules is due to close on April 3, 1995, and a public hearing will be held on April 4, 1995. (Second Bronston Aff. ¶ 3, Ex. A). The proposed rules also set forth deadlines for the submission of franchise applications, DOITT's review of such applications, and the preparation of franchise agreements. (Second Bronston Aff. ¶ 3, Ex. 1).

After DOITT certifies that an application is complete, it has sixty days to send a proposed franchise, which shall include "the terms of the applicant's certified application, the requirements of City Council Resolution 1639 and such other reasonable terms and conditions DOITT shall determine are appropriate to protect and advance the public interest." (Second Bronston Aff., Ex. A, § 6–03). Ultimately, in order for a franchise to be effective, it must be approved by the Franchise and Concession Review Committee as well as the Mayor. *Id.* There are no time limits on these particular steps in the franchising process. *Id.*

The intervening change in the factual circumstances necessarily altered the focus of Liberty's argument. As Lloyd Constantine, counsel for Liberty, stated at oral argument on March 1, 1994:

"the day before yesterday, ... there was no process. And now we have a process. And the process is fraught with and pock marked with boundless discretion."

(Tr. 45). At oral argument, Liberty complained that the RFP allowed the City unfettered discretion, both substantively and temporally, in how it grants franchises and that Liberty could not wait as long as the City's process would require.[33] (*See, e.g.,* Tr. at 10–11, 45–46).

---

**33.** This claim is raised in the eighth cause of action.

With the exception of its clear inapplicability to the Non–Common Systems, Resolution 1639 ... is vague, and vests the City and DOITT with normless and unfettered discretion to grant or deny cable television franchises. Resolution 1639 purports to grant the City and DOITT normless and unfettered discretion to prevent and burden protected speech activity and is therefore facially invalid as violative of the due process clause of the Fourteenth Amendment.

(Second Amd.Compl. ¶ 96).

■ Due to this intervening change in circumstances, it is apparent that Liberty's due process claims are not ripe. Unlike the situation when the action was filed, a procedure is in place through which Liberty can apply for a franchise. It has not done so, and, of course, it cannot be said at this point how long that process will take or what the substantive outcome will be. Rather than ruling in a vacuum on issues that might never arise, considerations of ripeness require that the process be permitted to go forward, both because certain issues might never arise and because a more fully developed factual record is required for reasoned adjudication of Liberty's claims. In short, the franchising process is ongoing; there has not been any final agency action taken. *See Weissman v. Fruchtman,* 700 F.Supp. 746, 755–57 (S.D.N.Y.1988) (explaining that plaintiffs' procedural due process claims were premature where city agency had not yet made a "sufficiently final decision").

In addition, as the City pointed out at argument, the Cable Act requires DOITT to act reasonably. 47 U.S.C. § 541(a)(1).[34] If DOITT acts unreasonably at some point in the future, either by unreasonably prolonging the proceedings or by imposing unreasonable burdens, Liberty has ready means to address the situation then on a more fully developed record of actual facts from which it may argue that a due process violation occurred rather than arguing from the possibilities and likelihoods relied on today.

With respect to the question of hardship to the parties of withholding decision, the same analysis applies here as applied to Liberty's First Amendment claim.

Thus, Liberty's Due Process claims are not ripe for adjudication.

**B.** *Sixty Sutton's and Veerman's Claims*

Plaintiffs Veerman and Sixty Sutton (the "Subscribers") assert, *inter alia,* that the requirements of the Cable Act interfere with their right to engage in protected speech

activity on private property in violation of their First Amendment rights (Second Amd. Compl. ¶¶ 75, 78) and that defendants' conduct violates their due process rights (Second Amd.Compl. ¶¶ 90, 96). Defendants have also moved to dismiss these claims on, *inter alia,* the ground that they are not ripe. For the reasons set forth below, that motion is granted with respect to the Subscribers' First Amendment and due process claims.

**1.** *First Amendment Claims*

■ In asserting their various First Amendment claims, the Subscribers urge that they have a First Amendment right to receive information that is separate from Liberty's right to broadcast that information. In support of their position they cite, *inter alia, Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 756–57, 96 S.Ct. 1817, 1823, 48 L.Ed.2d 346 (1976) ("[T]he protection afforded is to the communication, to its source and to its recipients both.... [F]reedom of speech necessarily protects the right to receive.") (citations and internal quotations omitted); *Lamont v. Postmaster General of United States,* 381 U.S. 301, 308, 85 S.Ct. 1493, 1497, 14 L.Ed.2d 398 (1965) ("The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers.") (Brennan, J., concurring); *Westmoreland v. Columbia Broadcasting System, Inc.,* 752 F.2d 16, 22 (2d Cir.1984) ("[T]he public ... has First Amendment interests that are independent of the First Amendment interests of speakers.") *See also Board of Educ., Island Trees Union Free Schl. Dist. No. 26 v. Pico,* 457 U.S. 853, 867, 102 S.Ct. 2799, 2808, 73 L.Ed.2d 435 (1982) (noting that "the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom"); Sheryl A. Bjork, "Indirect Gag Orders and the Doc-

---

**34.** This section provides that:
A franchising authority may award, in accordance with the provisions of this subchapter, 1 or more franchises within its jurisdiction; except that *a franchising authority* may not grant

an exclusive franchise and *may not unreasonably refuse to award an additional competitive franchise.*
47 U.S.C. § 541(a)(1) (emphasis added).

trine of Prior Restraint", 44 *U.Miami L.Rev.* 165, 187 (Sept. 1989) (arguing that the right to receive information exists "apart from the right to speak"); Rene L. Todd, "A Prior Restraint by Any Other Name: The Judicial Response to Media Challenges of Gag Orders Directed at Trial Participants", 88 *Mich. L.Rev.* 1171, 1190–91 (April 1990) (noting that "the [Supreme] Court has given little guidance as to the scope of a right to receive information").

Defendants, on the other hand, argue that the Subscribers' rights are wholly derivative from Liberty's rights and, thus, that the Subscribers do not have any greater First Amendment rights to receive cable programming than Liberty has to transmit it. *See, e.g., Board of Educ., Island Trees Union Free Schl. Dist. No. 26 v. Pico, supra,* at 867, 102 S.Ct. at 2808 (stating that the "right to receive ideas follows ineluctably from the *sender's* First Amendment right to send them"); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., supra,* 425 U.S. at 757, 96 S.Ct. at 1823 (stating that there is a First Amendment right to receive information and that *"[i]f* there is a right to advertise, there is a reciprocal right to receive the advertising) (emphasis added); *In re Dow Jones & Co.,* 842 F.2d 603 (2d Cir.), *cert. denied,* 488 U.S. 946, 109 S.Ct. 377, 102 L.Ed.2d 365 (1988); *Bicknell v. Vergennes Union High Schl. Bd. of Directors,* 475 F.Supp. 615, 620–21 (D.Vt.1979) (holding that a school board's decision to ban certain books from a high school library did not infringe students' First Amendment rights and explaining that "The right to receive information in the free speech context is merely the reciprocal of the right of the speaker.... The students' right to review those works through the school library, expressed as the Constitutional right to receive information, is no broader [than the rights of works purchased by the school library or retained on the shelves]"), *aff'd,* 638 F.2d 438 (2d Cir. 1980); George J. Baldasty & Roger A. Simpson, "The Deceptive 'Right to Know': How Pessimism Rewrote the First Amendment", 56 *Wash.L.Rev.* 365, 374–75, 393–95 (July 1981) (arguing that the "right to receive information" is "a derivative right appropriately encompassed by the First Amendment").[35]

For example, in *In re Dow Jones & Co.,* 842 F.2d 603, several news agencies appealed a "gag order" directed at prosecutors, defendants and defense counsel (but not the press) which was designed to prohibit all extrajudicial speech relating to the pending "Wedtech" case. The Court of Appeals explained that the right of the media to receive speech was derivative of the rights of the trial participants to speak and did not enlarge the would-be speakers' First Amendment rights. As the Court stated:

> [W]hen considering the merits, the press' right to receive speech does not enlarge the rights of those directly subject to the restraining order. Success on the merits for the news agencies is entirely derivative of the rights of the trial participants to speak.

*Id.* at 608.[36]

■ Assuming *arguendo* that the Subscribers' First Amendment rights are not

**35.** In *League of Women Voters of California v. Federal Communications Comm'n.,* 489 F.Supp. 517 (C.D.Cal.1980), the Court did not distinguish broadcasters and recipients of speech with respect to the threshold question of ripeness. Plaintiffs there sought declaratory and injunctive relief that 47 U.S.C. § 399(a), forbidding non-commercial broadcast licensees from editorializing, endorsing, or opposing candidates for public office, violated the First Amendment. *Id.* at 518. The plaintiffs included both broadcasters and would-be recipients of speech. *Id.* at 519–520. The non-broadcasters challenged the statute as interfering with their right to receive the free speech of broadcasters. *Id.* at 520. The Court dismissed the case, in part on ripeness grounds. *Id.* at 521. The Court noted that there was "a distinct likelihood" that the FCC would not seek to penalize the broadcaster, and that the hardship to the parties could not yet be determined. *Id.* at 520.

**36.** Similarly, in *United States v. Simon,* 664 F.Supp. 780 (S.D.N.Y.1987), in which a number of news agencies asked the District Court to vacate an earlier version of the "gag order" at issue in *Dow Jones,* the Court stated that the news agencies' right to receive information was "entirely derivative" of the rights of the speaker. *Id.* at 786. As the Court explained:

> a potential recipient of speech faces a two-step hurdle before he may successfully challenge, on First Amendment grounds, a restraint on the right of others to speak. First, his right to

derivative of Liberty's, the Subscribers do recognize that the government may regulate speech activity undertaken in the privacy of one's own home to protect third parties from injury. (*E.g.*, Sixty Sutton's and Veerman's Reply Mem. at 3).[37] For example, as the Subscribers correctly note, a person may read pornography in the privacy of his or her own home. *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). In *Stanley*, the Supreme Court held that Georgia's asserted interest in preventing the poisoning of the minds of a reader of pornography was clearly insufficient to justify encroaching upon the right to be free from "unwanted governmental intrusions into one's privacy"—a right which is of particularly great significance in the context of one's home. *Id.* at 564–66, 89 S.Ct. at 1247–49. However, this right is not absolute; in *Osborne v. Ohio*, 495 U.S. 103, 111, 110 S.Ct. 1691, 1697, 109 L.Ed.2d 98 (1990), the Supreme Court held that states may proscribe the possession of child pornography. The difference between *Stanley* and *Osborne*, the Court explained, was that the statute challenged in *Osborne* was enacted in order to protect third parties, namely, the victim of child of pornography. *Id.* at 109, 110 S.Ct. at 1696.

Similarly, the Supreme Court has ruled in *City of Ladue v. Gilleo*, —— U.S. ——, ——, ——, 114 S.Ct. 2038, 2041, 2047, 129 L.Ed.2d 36 (1994) that a statute which prevented homeowners from putting signs in their windows was unconstitutional. However, in *Metromedia v. City of San Diego*, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981), in which the Court struck down a San Diego ordinance that imposed "substantial prohibitions on the erection of outdoor advertising displays within the city", *id.* at 493, 101 S.Ct. at 2885, the Court stated unequivocally that, "at times First Amendment values must yield to other societal interests." *Id.* at 501, 101

S.Ct. at 2889. The Court explained that in order to evaluate the constitutionality of an ordinance such as this, a court must "[assess] the First Amendment interest at stake and [weigh] it against the public interest allegedly served by the regulation." *Id.* at 502, 101 S.Ct. at 2890. In order to do this, the Court continued, there need be "a particularized inquiry into the nature of the conflicting interests at stake ... beginning with a precise appraisal of the character of the ordinance as it affects communication." *Id.* at 503, 101 S.Ct. at 2890. In the context of billboards, for example, the Court noted that the city's interest in traffic safety and its aesthetic interest in preventing "visual clutter" could prohibit commercial billboards in certain circumstances. *Id.* at 511–12, 101 S.Ct. at 2894–95. Thus, the lesson of *City of Ladue* and *Metromedia*, as Subscribers so succinctly put it, is that "[h]omeowners can place signs in their windows ... but not billboards on their front lawns because community interests in aesthetics are affected." (Reply Mem. of Pls. Sixty Sutton and Veerman in Support of Mot. for Prelim.Inj. at 3).

■ The relevant lesson of these two examples, pornography and billboards, is that the government may regulate speech activity, even speech activity taking place in a person's home, in order to protect the interests of third parties. Applying this principle to the case at hand makes it apparent that the Subscribers' claims are not yet ripe.

As to the first prong of the *Abbott Laboratories* test, one may posit certain social interests justifying the imposition of regulatory burdens on Liberty which burdens would affect cable service to the Subscribers. However, those interests can only be debated in the abstract at this point; there is no record from which I can "[assess] the First Amendment interest at stake and [weigh] it

receive speech becomes cognizable only when an individual has indicated a willingness to speak and is being restrained from doing so. *See Virginia State Board*, 425 U.S. at 756, 96 S.Ct. at 1822. Under such circumstances, the potential recipient would have standing to challenge the restraint. Even then, however, the challenge may be defeated if the restraints imposed upon the putative speaker are within the limits permitted by the Constitution. *Thus, the potential recipient's rights are entirely derivative of those of the speaker.* *Id.* (emphasis added).

**37.** Reference is made to the Reply Memorandum of Plaintiffs Sixty Sutton Corp. and Jack A. Veerman in Support of Motion for a Preliminary Injunction.

against the public interest allegedly served by the regulation." *Metromedia,* 453 U.S. at 502, 101 S.Ct. at 2890 (citations omitted).

For example, the concern has been raised that Liberty, if unrestrained by regulation, would "cherry pick" the most desirable buildings for its cable service. An informative discussion of the perils of cherry picking can be found, ironically enough, in a letter dated April 7, 1992 written on behalf of Liberty to the FCC by W. James MacNaughton, counsel to the Subscribers here, urging the FCC to *defend* the definition of "cable system" in the Cable Act in the *Beach* litigation. (Jacobs Aff. ¶ 9, Ex. T at 1). As counsel stated:

> Stated metaphorically, the Commission has always encouraged "cherry picking" by MDS and SMATV operators to promote competition with cable companies.... But once the "cherries" start getting plucked in bunches, then the interests of the local regulators and competing cable companies take on greater importance because more people and buildings in the community are affected. It is quite reasonable for Congress and the Commission to tell Petitioners that they must pick the "cherries" one at a time. This may be unpalatable to Petitioners but it is not unconstitutional.

(Jacobs Aff., Ex. T at 12–13). Thus, as Subscribers must agree, cherry picking, at some point, affects the public interest, and thus the interests of local regulators become more important. However, the facts are not yet developed which would permit me to evaluate the competing interests implicated by the cherry harvest. In any event, there is no final agency action on the issue. *In re Combustion Equip. Assocs., Inc., supra,* 838 F.2d at 37–38 (quoting *Gardner & Toilet Goods Assoc., supra,* 387 U.S. at 171, 87 S.Ct. at 1528).

In looking at the "hardship to the parties" prong of the *Abbott Laboratories* test, just as with Liberty, it cannot be said if and in what way the Subscribers' First Amendment rights might be impaired by the City or the State defendants. As was discussed above in Point IA1b, the assertion that cable service will soon be cut off is unsupported. Merely asserting that Liberty's cable service to Sixty Sutton is going to be disrupted does not make it so. The Standstill Order is not a final determination in the matter. (Grow Aff. ¶ 32). Also, in at least one prior case in which the NYSCC issued an Order to Show Cause, a "Cease and Desist Order" was not issued for a year. *Id.* In addition, that operator was permitted to apply for a franchise, which was granted, and there was *no* interruption in service. *Id.*[38] Balanced against this speculative hardship is the same significant hardship on NYSCC and DOITT as was discussed above with respect to Liberty—premature judicial meddling in their processes. Accordingly, the Subscribers' First Amendment claims are dismissed as not ripe.

### 2. *Due Process*

The Subscribers' due process claims are jointly pleaded with Liberty's in the sixth and eighth claims in the Second Amended Complaint (¶¶ 89–90, 93–96). Since the City's notice of rulemaking has been issued and contemplates comment by interested parties such as the Subscribers, the Subscribers' due process claims are not yet ripe for the same reasons as Liberty's. *See* section IA2, *supra.*

## II. *Equal Protection*

All three plaintiffs assert equal protection claims. They challenge 47 U.S.C. § 522(7), alleging that:

**38.** The situation here can be distinguished from that in *Patel and Patel v. City of South San Francisco,* 606 F.Supp. 666 (N.D.Cal.1985) when plaintiff operated a "adult hotel" in violation of the zoning ordinance, and part of plaintiff's activities involved the airing of "adult" programming in the motel rooms. *Id.* at 668–69. The plaintiff sought, *inter alia,* a declaration that the ordinance was unconstitutional. *Id.* at 669. The Court noted that the case was ripe for adjudication because it was "not disputed that the city will enforce the Ordinance against plaintiff" unless the Court prevented the enforcement. *Id.* The Court also noted that the city sought to enforce the Ordinance in the counterclaim in that very action. *Id.* It simply cannot be said with the same assurance here that the Subscribers face the loss of Liberty's cable service.

The Common Ownership Requirement in 47 U.S.C. § 522(7)(B) discriminates between the Common Systems and Non–Common Systems in requiring a "franchise" only for the Non–Common Systems ... This discrimination in 47 U.S.C. § 522(7)(B) violates equal protection principles of the due process clause of the Fifth Amendment to the United States Constitution ... under the "strict scrutiny" standard because it adversely affects the fundamental right of Liberty to engage in a speech activity on private property using the Non–Common System at the Sutton Building.

(Second Amd.Compl. ¶¶ 83–84). (*See also* Second Amd.Compl. ¶ 88, 90).

### A. *Ripeness*

██ Unlike the other claims raised by plaintiffs, their equal protection claims are ripe. As the Court of Appeals for the District of Columbia explained in *Beach I:*

Unlike petitioners' First Amendment claim, the "rational basis" claim does not depend on particular circumstances. First, the standard for evaluating that claim does not vary with local conditions.... Second, the application of that standard is also context-invariant.... Thus, the rational-basis claim is "purely legal" for the purposes of *Abbott Laboratories,* and we reach the merits.

959 F.2d 975, 986 (D.C.Cir.1992). The Court of Appeals then directed the FCC to consider within sixty days whether there was some "conceivable basis" for requiring the local franchising of external, quasi-private SMATV facilities but not for wholly private or internal facilities. *Id.* at 987. The fact that the Supreme Court addressed the merits of the *Beach* petitioners' equal protection claims in *Beach III* further indicates that plaintiffs' equal protection claims are ripe. —— U.S. ——, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). Accordingly, the motion to dismiss these claims on the grounds of ripeness is denied.

### B. *Abstention*

██ Defendants have also moved to dismiss the complaint under various theories of abstention. The Supreme Court, however, has repeatedly emphasized that a federal court's obligation to adjudicate claims within its jurisdiction is "'virtually unflagging.'" *New Orleans Public Service v. Council of the City of New Orleans,* 491 U.S. 350, 359, 109 S.Ct. 2506, 2513, 105 L.Ed.2d 298 (1989) (quoting *Deakins v. Monaghan,* 484 U.S. 193, 203, 108 S.Ct. 523, 530, 98 L.Ed.2d 529 (1988)). Furthermore, "'the presence of a federal basis for jurisdiction,'" as in this case, "'may raise the level of justification needed for abstention.'" *County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1309 (2d Cir.1990) (quoting *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 815 n. 21, 96 S.Ct. 1236, 1245 n. 21, 47 L.Ed.2d 483 (1976)). I also note that abstention "remains 'the exception, not the rule.'" *New Orleans Public Service,* 491 U.S. at 359, 109 S.Ct. at 2513 (quoting *Colorado River,* 424 U.S. at 813, 96 S.Ct. at 1244 (1976)). Indeed, the Court of Appeals has recently noted that a federal court would be remiss to abstain from resolving any constitutional challenge—and certainly a constitutional challenge to a federal statute—in the expectation that a state court might reach the issue. The Court explained that "[f]ederal courts do not need to wait for a state court's interpretation of federal constitutional law." *Williams v. Lambert,* 46 F.3d 1275, 1282 (2d Cir.1995). In following these principles, I find that abstention with respect to plaintiffs' equal protection challenge would be inappropriate. Accordingly, the motion to dismiss those claims on the grounds of abstention is denied.

### C. *Preliminary Injunction*

██ Turning then to the Subscribers' motion for a preliminary injunction, the standard in this circuit for preliminary injunctive relief requires the moving party to demonstrate:

(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979).

Liberty's claim challenging the distinction drawn between Common Systems and Non–Common Systems is precisely the claim rejected by the Supreme Court in *Beach III.* The Subscribers' claim is virtually identical in that First Amendment considerations are involved in both claims, but Liberty's are as "speaker" and (assuming that the Subscribers' rights are not derivative of Liberty's), the Subscribers' rights are as "recipients".

In *Beach III,* the Supreme Court addressed the question of whether there was any rational basis justifying the distinction between facilities serving separately owned and managed buildings and those serving one or more buildings under common ownership or management. —— U.S. at ——, 113 S.Ct. at 2099. The Court reversed the decision of the Court of Appeals for the District of Columbia Circuit, which had held that this portion of the Cable Act was unconstitutional, *id.* at ——––——, 113 S.Ct. at 2100–01, and upheld the constitutionality of the common-ownership distinction in the Cable Act under the rational basis test. *Id.* at ——, 113 S.Ct. at 2103. In part because the Court of Appeals had not considered petitioners' argument that heightened scrutiny was appropriate, the Supreme Court did not reach that argument either. On remand from the Supreme Court, however, the District of Columbia Circuit found that "there is no basis for application of a heightened scrutiny standard" to the question of whether the common-ownership requirement violates Equal Protection. *Beach IV,* 10 F.3d 811 (D.C.Cir. 1993). Thus, the Beach cases effectively preclude the equal protection claims in the instant case.

In its reply memorandum, Liberty attempts to distinguish *Beach III* from the instant case. It writes:

> Both of the Circuit Court decisions and the Supreme Court decision in *Beach* were based on an equal protection analysis of the cross-ownership provisions of the Cable Act. There was never any consideration of the First Amendment burdens imposed by the challenged provisions.

(Liberty's Reply Mem. at 17). It is true that the Supreme Court's decision was limited to an equal protection analysis in *Beach III.* —— U.S. at —— n. 3, 113 S.Ct. at 2100 n. 3. However, the reason that the Supreme Court did not address the constitutionality of § 522(7) under the First Amendment was not, for example, because those claims had never been raised. The reason was, rather, that the petitioners' First Amendment claims were found not yet ripe by the Court of Appeals. *Id.* As discussed *supra,* plaintiffs' First Amendment challenge here is, similarly, non-ripe.

Given the *Beach* Courts' holdings, *supra,* and Mr. MacNaughton's apparent admission that regulations designed to avoid cherry-picking "may be unpalatable ... but ... are not unconstitutional" (Jacobs Aff., Ex. T at 12–13), plaintiffs cannot demonstrate that they are entitled to a preliminary injunction. They show neither that they have a likelihood of success on the merits, nor that there are sufficiently serious questions going to the merits as to make them a fair ground for litigation. *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., supra,* 596 F.2d at 72. In addition, for the reasons discussed at Point IA1b, plaintiffs have not demonstrated irreparable harm or a balance of hardships tipping decidedly in their favor. Thus, plaintiffs' motion for a preliminary injunction on their equal protection claims is denied.

### III. *Plaintiffs' Remaining Claims*

The remaining miscellaneous claims asserted by plaintiffs, *i.e.,* the seventh, ninth, tenth, eleventh, and twelfth causes of action, are not ripe, particularly in light of the City's recently-published notice of proposed rulemaking. For example, in plaintiffs' seventh cause of action, they assert that Resolution 1639 is unreasonable pursuant to 47 U.S.C. § 541(a)(1) because it imposes terms and conditions more burdensome than those allowed by 47 U.S.C. § 521 *et seq.* and by New York state law. However, Resolution 1639 does not impose any terms and conditions directly upon Liberty. *See* Resolution 1639. It is, rather, the terms of whatever franchise, if any, that is issued by DOITT which will establish what burdens Liberty may face.

Since a franchise has not yet been issued but the notice of rulemaking has been published, it is premature to consider this claim for the reasons set forth above.

Similarly, plaintiffs' ninth claim, that DOITT has violated 47 U.S.C. § 541(a) by refusing to grant Liberty a franchise, is also not yet ripe; DOITT has not so refused.

Plaintiffs' tenth claim asserts that the defendants have made a "final determination denying Liberty" a franchise. (Second Amd. Compl. ¶ 101). Clearly that is not the case, and thus it is not yet appropriate to address this claim.

█ Plaintiffs' eleventh claim for relief, that 47 U.S.C. § 521 *et seq.* and FCC decisions have preempted the regulatory authority of the City over the provision of "premium" cable service to the Subscribers to the extent that the City may not prevent the receipt of Liberty's "premium" service by the Subscribers is not ripe. The City has not prevented the receipt of Liberty's "premium service", and it is not yet known what actions the City may take.

Finally, plaintiffs' twelfth claim alleges as a catch-all that the defendants deprived plaintiffs of their rights under the Supremacy Clause, the First Amendment, the equal protection and due process clauses of the United States Constitution and 47 U.S.C. § 521 *et seq* in violation of 42 U.S.C. § 1983. Except with respect to the equal protection claims discussed in II, *supra*, the twelfth claim is not ripe for the reasons discussed above.

### CONCLUSION

Defendants' motion to dismiss on the ground of lack of ripeness is granted as to plaintiffs' first, second, third, seventh, eighth, ninth, tenth and eleventh claims, as to so much of plaintiffs' sixth claim as asserts a due process claim and as to all of plaintiffs' twelfth claim except that portion of it that asserts an equal protection claim.

With respect to plaintiffs' fourth and fifth claims and so much of their sixth and twelfth claims as assert an equal protection claim, defendants' motions to dismiss on the basis of ripeness and abstention are denied, and plaintiffs' motion for a preliminary injunction is denied.